# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 10, 2026

Lyle W. Cayce
Clerk

No. 25-30430

United States of America,

*Plaintiff—Appellee*,

Tristan Barber,

*Defendant—Appellant*.

―――――――――――――――――――――――――――――

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 3:24-CR-152-1

―――――――――――――――――――――――――――――

Before Duncan, Oldham, and Wilson, *Circuit Judges*.

Per Curiam:[*]

Appellant Tristan Barber was arrested in connection with a gang-related shooting. He pled guilty of being a felon in possession of a firearm and illegally possessing a machinegun. The district court enhanced Barber's sentence after finding he had (1) used the firearm in connection with another offense (attempted murder); and (2) caused his victims more than serious, but less than permanent, bodily injury. Barber challenges both sentence enhancements on appeal. We AFFIRM.

―――――――――――――――――――――

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 25-30430

I

In March 2024, two "Bleedas" gang members—David Catherine and Jerikco Thomas—were seated in a red Mazda, waiting to exit a Walmart parking lot in Monroe, Louisiana. A silver Chevrolet Cruze pulled up behind them. Two masked men got out of the backseat, ran up to the Mazda, and opened fire. Catherine and Thomas were shot multiple times. They tried to drive away but crashed into a nearby Murphy Oil gas station. The shooters jumped back into the Cruze and fled.

Officers arrived soon after and provided Catherine and Thomas with medical care. They were then taken to a local hospital in Monroe. Given the severity of their injuries, however, they were transferred to Ochsner LSU Health Medical Center in Shreveport. In the end, only Thomas's injuries required surgical intervention, and both were discharged a few days later. Nothing in the record suggests either victim suffered any permanent injury or impairment.

Meanwhile, the police investigation was in full swing. Investigators recovered twenty-seven .40 caliber shell casings from the scene. They spoke to multiple eyewitnesses and reviewed surveillance footage of the shooting, determining (1) the shooters were both male; (2) one shooter was much taller than the other; (3) at least one shooter used an automatic weapon; and (4) the vehicle make, model, and license-plate number. They located the Cruze later that day, identifying the driver but not the shooters because the backseat door handles had been wiped clean.

Fortunately, police informants had additional information. They told investigators the shooting was gang related and involved two rival Louisiana gangs—the YNN and the Bleedas. These informants likewise identified the shooters as Kilarrious Owens and Barber. Officers located Owens a few days later during an unrelated traffic stop. They searched his vehicle and

discovered a Smith & Wesson SV40 .40 caliber handgun. After ballistics confirmed it matched seven of the casings recovered from the shooting, Owens was arrested.

Forensic analysis of Owens's phone shed more light on his and Barber's involvement in the shooting. For example, investigators uncovered a video Owens recorded from the backseat moments before the shooting as they stalked the Mazda. They also reviewed Owens's texts and call history. On the day of the shooting, Owens repeatedly contacted "Chapo" or "Chopstick"—nicknames associated with Barber—to acquire a gun for the shooting. Investigators likewise found a group-message thread comprised of YNN gang members—Owens and Barber among them—showing Barber requesting and receiving permission from another gang to do the hit on Catherine and Thomas.

Evidence beyond the texts also tied Barber to the shooting. Geolocation data placed Barber's phone near the Murphy Oil station at the time of the shooting. And surveillance footage of Owens's apartment complex minutes before the shooting showed Owens and a male matching Barber's physical description getting into the backseat of the Cruze. Based on this evidence, officers acquired a warrant for Barber's arrest.

A few days later, officers arrested Barber in a dorm room of a fellow YNN gang member at Grambling State University. They found his phone, along with a fully automatic Glock 22 .40 caliber handgun in his backpack. Ballistics matched the Glock 22 to nineteen of the twenty-seven casings recovered from the shooting.

After Barber's arrest, yet more evidence emerged against him. For example, investigators found on his social-media account an image of Barber holding the same Glock 22 and making gang-related threats. And according to confidential informants, the gang who ordered the hit on Catherine and

Thomas had paid YNN $80,000 for the killing. Barber's own YouTube video corroborated this. A few days after the shooting, Barber posted a video titled "80K" in which he rapped about using a Glock against a Bleedas member; another lyric mocked a shooting victim for losing control of his car.

Barber's state indictment charged him with attempted murder, whereas his federal indictment charged him only with two counts of felon in possession in violation of 18 U.S.C. § 922(g)(1) and two counts of illegal possession of a machinegun in violation of § 922(o). Barber pled guilty to one count of each violation. Applying the cross reference in § 2K2.1(c)(1)(A) of the felon-in-possession guidelines, the PSR set Barber's base offense level at 33 based on the offense level for attempted murder. *See* U.S. Sent'g Guidelines Manual ("U.S.S.G.") §§ 2K2.1(c)(1)(A) (felon-in-possession cross reference); 2A2.1(a)(1) (base offense level for attempted first-degree murder). The PSR further increased Barber's base level by three under § 2A2.1(b)(1)(C) after finding that the victims' injuries fell between serious bodily injury and permanent or life-threatening bodily injury. After subtracting three for Barber's acceptance of responsibility, his total offense level was 33 and his advisory range was 151 to 188 months' imprisonment.

The district court overruled Barber's objections to both sentence enhancements and imposed concurrent sentences of 180 months on the § 922(g) count and 120 months on the § 922(o) count. Barber appeals, challenging both enhancements.

## II

We review the district court's interpretation of the Sentencing Guidelines *de novo* and its factual findings for clear error. *United States v. Nash*, 729 F.3d 400, 403 (5th Cir. 2013). "The government must prove sentencing enhancements by a preponderance of the evidence." *United States v. Juarez*, 626 F.3d 246, 251 (5th Cir. 2010). Direct evidence is not

necessary to carry that burden, however, for the district court "is permitted to make common-sense inferences from the circumstantial evidence." *United States v. Robinson*, 654 F.3d 558, 562 (5th Cir. 2011) (quotation omitted). Such inferences are also reviewed for clear error. *United States v. Caldwell*, 448 F.3d 287, 290 (5th Cir. 2006). We will uphold a court's factual finding if it "is plausible in light of the record as a whole." *Ibid.*

## III

### A

We begin with the district court's application of the cross reference in § 2K2.1(c)(1)(A), which provides as follows:

> If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm or ammunition cited in the offense of conviction with knowledge or intent that it would be used or possessed in connection with another offense, apply—§ 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above.

U.S.S.G. § 2K2.1(c)(1)(A).

Applying this section, the district court found the evidence sufficient to show Barber used the Glock 22 in connection with the attempted murder of Catherine and Thomas. The court applied the base offense level for attempted murder (33) because it is higher than the level Barber would have received for felon in possession (26).

Barber challenges the application of the cross reference on four grounds. First, Barber argues the circumstantial evidence linking him to the attempted murder is unreliable, unauthenticated, or inconclusive. Second, he argues that the "absence of direct evidence establishing [his] participation

No. 25-30430

[in the shooting] is fatal to the cross reference." Third, the "temporal and geographic disconnect" between the shooting and Barber's arrest, he claims, "undermines any inference that his firearm possession was 'in connection with' the attempted murder." Fourth, he argues the Government failed to show he had malice aforethought. Barber contends these deficiencies—whether considered independently or together—show that the court clearly erred in applying the cross reference. We disagree for the following reasons.

We first consider Barber's attack on the circumstantial evidence linking him to the shooting, much of which is recounted in his PSR. A PSR generally bears sufficient indicia of reliability to meet the preponderance standard. *See United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012). When information in a PSR relies on the results of a police investigation, including investigative reports and witness interviews, a sentencing court "may properly find sufficient reliability." *United States v. Fields*, 932 F.3d 316, 320 (5th Cir. 2019) (quotation omitted). "The defendant has the burden of showing that the information relied on by the district court in the PSR is materially unreliable." *United States v. Ford*, 558 F.3d 371, 377 (5th Cir. 2009) (per curiam) (quotation omitted). "Mere objections do not suffice as competent rebuttal evidence." *United States v. Parker*, 133 F.3d 322, 329 (5th Cir. 1998). When a defendant fails to present rebuttal evidence, the district court is "free to adopt the PSR's findings without further inquiry or explanation." *United States v. Rodriguez*, 602 F.3d 346, 363 (5th Cir. 2010).

The district court properly rooted its reasons for applying the cross reference in the PSR's findings. Indeed, the PSR and police report contain detailed, mutually reinforcing facts:

- The Glock in Barber's backpack matched nineteen casings from the shooting.

- Witnesses heard automatic fire consistent with Barber's modified Glock.

- Barber's phone was near the Murphy Oil station when the shooting occurred.

- Messages tied Barber to the hit and to the victims.

- Surveillance footage placed Owens and a man matching Barber's build in the shooters' car minutes before the attack.

- Barber posted a video on YouTube referencing an "80K" hit on the Bleedas in which a rival lost control of his car.

Barber offered no rebuttal evidence undermining these facts. His mere objections to the reliability or conclusiveness of this evidence "do not suffice as competent rebuttal evidence." *Parker*, 133 F.3d at 329. As a result, the district court was "free to adopt the PSR's findings without further inquiry or explanation." *Rodriguez*, 602 F.3d at 363. Barber's first argument fails.

His other arguments fare no better. For instance, his suggestion that a lack of direct evidence alone constitutes clear error is belied by our precedent. *See Robinson*, 654 F.3d at 562 (permitting enhancement based on "common-sense inferences from the circumstantial evidence"). Equally unavailing is his suggestion that the temporal and geographic disconnect of his arrest render his felonious possession not "in connection with" the attempted murder. We have construed the "broad language of section 2K2.1(c)(1)" and its "unlimited reference[] to 'another offense'" as embracing "all illegal conduct performed or intended by [the] defendant concerning a firearm involved in the charged offense." *United States v. Gonzales*, 996 F.2d 88, 92 (5th Cir. 1993). Moreover, the cross reference's commentary gives an example where the defendant's use of a charged firearm in a burglary *eight months prior* still constituted use "in connection with" the same "course of conduct." U.S.S.G. § 2K2.1 cmt. n.13(D)(i). Accordingly, application of the cross reference was not barred by the

eighteen-day gap between the shooting and Barber's arrest. Nor was it barred by the fact that Barber was arrested "more than 40 miles away" from the Murphy Oil station.

Finally, Barber's assertion that the Government failed to prove intent to kill is meritless. Because he raises this argument for the first time on appeal, we review for plain error. *See United States v. Sanchez-Arvizu*, 893 F.3d 312, 315 (5th Cir. 2018) (per curiam). There was no error, plain or otherwise. The district court had copious evidence supporting a finding of Barber's intent to kill: Armed with his automatic Glock 22, Barber approached a car occupied by rival gang members—persons he had discussed killing in text messages—and proceeded to fire nineteen rounds at close range into the car. That circumstantial evidence, considered in context, amply supports the inference that Barber intended to commit murder. *See United States v. James*, No. 25-50144, 2026 WL 1552729, at *5 (5th Cir. June 2, 2026) ("Intent [to kill] is usually proved circumstantially, because a defendant's state of mind is rarely announced aloud."); 40A AM. JUR. 2D *Homicide* § 541 (2026) ("[A]n intent to kill, as an element of attempted murder, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred.").

In sum, the district court did not clearly err when applying the attempted murder cross reference.

B

We turn to Barber's challenge of the three-level injury enhancement.

Section 2A2.1(b)(1) provides a two-level enhancement for "serious bodily injury," a four-level enhancement for "permanent or life-threatening bodily injury," and a three-level enhancement for injury falling between those categories. "Serious bodily injury" includes an injury "involving

extreme physical pain," "protracted impairment of a function of a bodily member," or "requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 cmt. n.1(L). "Permanent or life-threatening bodily injury" includes an injury involving "a substantial risk of death," "loss or substantial impairment of the function of a bodily member . . . that is likely to be permanent," or "an obvious disfigurement that is likely to be permanent." *Id.* § 1B1.1 cmt. n.1(J). The severity of injury is a factual question reviewed for clear error. *United States v. Davis*, 19 F.3d 166, 171 (5th Cir. 1994).

The district court found a three-level enhancement was appropriate given the victims' multiple gunshot wounds, which necessitated surgical intervention for one victim. That finding was plausible, to say the least. Both victims were shot multiple times: Thomas in the back and leg, Catherine in the back and arm. Due to the severity of their injuries, both were transferred from local hospitals to more advanced trauma facilities. Both remained hospitalized for multiple days, during which Thomas required surgery. The evidence supports the district court's finding that the injuries were severe but did not create a substantial risk of death or lead to permanent disfigurement.

Barber counters that the record supports only a two-level enhancement for "serious bodily injury" because surgery and hospitalization are listed in that category's definition. True, surgery and hospitalization *can* establish serious bodily injury. But § 2A2.1(b)(1) creates a middle-range enhancement for injuries worse than serious bodily injury but not as dire as permanent or life-threatening injury. The district court reasonably placed the victims' injuries—involving multiple gunshot wounds to the back, arm, and leg that required trauma transfer, multi-day hospitalization, and surgery—in that middle category.

Barber relies on *United States v. Jackson* to suggest the injury enhancement was improper. *See* 662 F. App'x 310 (5th Cir. 2016) (per curiam). *Jackson* is distinguishable, however. That decision vacated a four-level enhancement for a victim with four gunshots to the torso because the record lacked proof that the injuries were life threatening or that the victim experienced permanent impairment or disfigurement. *Id.* at 318–19. Here, by contrast, the evidence supported classifying the injuries as falling between the lowest and highest levels of severity, therefore meriting a three-level enhancement.

## IV

Barber's sentence is AFFIRMED.